UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Debra S. Stoddard                              Civil No. 09-1655 (PJS/FLN)

        Plaintiff

        v.                                      **REPORT AND
                                        RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant
_____

Ann M. Bildtsen, Esq., for Plaintiff
Lonnie F. Bryan, Assistant United States Attorney, for Defendant
_____

Plaintiff Debra Stoddard seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1382c. Plaintiff submitted a motion for summary judgment and Defendant submitted a motion for voluntary remand for further proceedings. (Doc. Nos. 13, 23.) Plaintiff opposes remand for further proceedings, and instead requests reversal with remand for award of benefits. For the reasons which follow, this Court recommends that Defendant's motion for voluntary remand for further proceedings be **GRANTED**, and Plaintiff's motion for summary judgment be **GRANTED IN PART AND DENIED IN PART**.

## I.  INTRODUCTION

1

Plaintiff filed an application for DIB on November 15, 2005, and an application for SSI on November 21, 2005. (Doc. No. 12, Administrative Record [hereinafter "Tr."] at 96-98, 99-102.) Her applications were denied initially and upon reconsideration. (Tr. 42-49.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on April 30, 2008. (Tr. 64, 21-41.) On September 4, 2008, the ALJ issued a decision denying Plaintiff's claims. (Tr. 7-20.) The Appeals Council denied Plaintiff's request for review on May 1, 2009 (Tr. 1-3), making the ALJ's decision final for purposes of judicial review. *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff commenced this action seeking judicial review of the Commissioner's decision on June 29, 2009.

## II.    STATEMENT OF FACTS

Plaintiff alleges disability from the following impairments: major depressive disorder; post traumatic stress disorder; panic disorder with agoraphobia; daily headaches; blindness; bilateral uveitis; bilateral cystoid macular edema; daily eye pain; and fixed pupils. (Tr. 120.) Plaintiff was 34-years-old on the alleged disability date. (Tr. 18.) She completed one year of college in 1985. (Tr. 128.) She has past relevant work as a cashier and restaurant night shift manager. (Tr. 129.) Plaintiff last worked in April 2004, and sold Avon for a number of months in 2005. (Tr. 129, 12.)

On October 2, 2003, Plaintiff saw Physician Assistant ("P.A.") Renee Coleman at Allina Medical Clinic, Mora and requested to go on Prozac for increasing depression. (Tr. 218.) P.A. Coleman noted Plaintiff had done well on Prozac in the past. (Id.) When Plaintiff followed up in January 2004, she said Prozac was helping significantly. (Tr. 217.)

Then, in May 2004, Plaintiff went to Cambridge Eye Associates and complained of poor

vision since October, but reported her eye trauma may have been caused when her husband punched her and pushed her eyes in with his thumbs on March 28 of that year. (Tr. 203.) Dr. Chad Christenson summarized his findings as follows. (Tr. 232.) Plaintiff's unaided visual acuity was CF (count fingers) at 4 feet on the right and 20/70 on the left. (Id.) Her BCVA (best corrected visual acuity) was 20/400 on the right and 20/40 on the left. (Id.) Her pupils were fixed.[1] (Id.) Plaintiff had partial posterior synechiae on her irises[2] and cataract formation on both eyes. (Id.) Dr. Christenson's impression was traumatic iritis and traumatic cataracts. (Id.) He referred Plaintiff to Minnesota Eye Consultants. (Tr. 232.) When Plaintiff was seen at Minnesota Eye Consultants on June 7, she complained of foggy vision for six months, difficulty with night driving, and poor color perception. (Tr. 207.) She was diagnosed with anterior and posterior uveitis[3] and cataracts. (Tr. 208.)

Dr. Howard Gilbert at the Retina Center also saw Plaintiff on June 7, 2004. (Tr. 226.) He noted that Plaintiff's visual acuity measured 20/160 on the right and 20/50 on the left. (Id.) Her pupils were fixed, small and regular. (Id.) There were prominent posterior synechia and mutton fat KP on the corneas. (Id.) Dr. Gilbert noted he gave Plaintiff a subtenon's Kenalog[4] injection in the right eye. (Id.) He opined there was probably a systemic association with

---

[1]     A fixed pupil is a pupil that does not react either to light or on convergence or in accommodation. Miller-Keane Encyclopedia & Dictionary of Medicine, Nursing & Allied Health 1480 (Saunders 7th ed. 2003) ("hereafter Miller-Keane Encycl. & Dictionary.")

[2]     Synechiae are adhesions, such as of the iris to the lens. Id. at 1718.

[3]     Uveitis is an inflammation of part or all of the middle tunic of the eye. Id. at 1859.

[4]     Kenalog is an anti-inflammatory glucocorticoid. Id. at 981.

3

Plaintiff's eye condition. (Id.) Plaintiff followed up on July 12, and reported that her color and contrast vision had improved since the injection, but she was having more difficulty reading. (Tr. 222.)

Plaintiff went to the Retina Center again on December 7, 2004, and said her vision had been better, but the last two months it had been cloudy, and she was seeing floaters. (Tr. 221.) She also reported increased headaches. (Id.) Dr. Gilbert noted that Plaintiff's uveitis looked quiet. (Id.)

On January 6, 2005, Dr. Gilbert wrote to Plaintiff regarding the condition of her eyes. (Tr. 225.) He noted that he saw Plaintiff three times, starting in June 2004. (Id.) On the first visit, she had "fairly prominent" uveitis in each eye with "pupils that were bound down and very small." (Id.) At her last visit on December 8, 2004, her eyes had quieted a great deal, and Dr. Gilbert did not see any active inflammation. (Id.) Plaintiff's diagnosis was quiet uveitis, and Dr. Gilbert recommended that she follow up in early Spring 2005. (Id.)

On April 4, 2005, Plaintiff saw Dr. Jack Schwinghamer at Allina Medical Clinic, Mora for evaluation of her headaches. (Tr. 213.) She reported that she had many headaches, starting behind the eyes and radiating into her head almost daily. (Id.) Dr. Schwinghamer prescribed Naprosyn and Midrin, and opined that her headaches were likely related to poor vision. (Id.)

Plaintiff was referred to Dr. Stephanie Hanisch at Kanabec County Family Services for therapy on April 13, 2005. (Tr. 229.) Plaintiff reported that she recently filed for divorce after sixteen years in an abusive marriage. (Id.) She reported that she struggled with depression for a long time, but first started medication in October 2003. (Id.) The medication improved her depression, but she still had significant symptoms including low energy, fatigue, and poor sleep,

which she admitted might be related to her six-month-old baby. (Id.) Due to her poor eyesight, Plaintiff reported she could not drive, and she became afraid of unfamiliar places. (Id.) She also reported suffering from significant anxiety attacks that could occur at any time or place. (Id.) Plaintiff also said she was having flashbacks of abuse by her husband. (Id.) She was hypervigilant and had an increased startle response. (Id.)

Dr. Hanisch noted Plaintiff lived with her boyfriend and her two children, a fourteen-year-old son and six-month-old daughter. (Tr. 230.) They lived in her boyfriend's father's home, but anticipated having to move. (Id.) On mental status examination, Dr. Hanisch noted Plaintiff was "obviously working quite hard to maintain her fragile defenses." (Id.) She diagnosed Plaintiff with major depressive disorder, moderate to severe; post traumatic stress disorder; panic disorder with agoraphobia; and a GAF score of 50.[5] (Tr. 230.)

On April 21, 2005, Plaintiff was evaluated by Dr. Pamela Rath at the University of Minnesota. (Tr. 241, 247. Plaintiff's visual acuity was 20/150 on the right and 20/100 on the left. (Id.) Cataracts and synechiae were present on examination. (Id.) Dr. Rath opined that Plaintiff's uveitis was active with bilateral low lying macular edema. (Tr. 247.) She prescribed several eye drops, and recommended repeat Kenalog injections. (Id.) Dr. Rath told Plaintiff it was not legal for her to drive with her current level of vision. (Id.)

---

[5] "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")). A GAF score of 41-50 indicates any serious impairment in social, occupational, or school functioning, and a score of 51-60 indicates moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 32.

Plaintiff began seeing a therapist, Beth Good, at Kanabec County Family Services in April 2005. (Tr. 343-44.) In therapy on May 13, 2005, Plaintiff reported having nightmares five times a week. (Tr. 345.) She also said that when she was having a flashback or panic attack, she had trouble discerning what was real. (Id.) She was having at least one panic attack a day, and found it hard to be around anyone who was upset. (Id.) Two weeks later, Plaintiff continued to have four or five nightmares a week. (Tr. 346.) Plaintiff's attention and memory had decreased since her last visit. (Tr. 345, 346.) Plaintiff was started on Paxil, and Prozac was discontinued. (Tr. 346.)

Also in May, Plaintiff received occupational therapy to assist her in reading, reducing discomfort from glare, reducing household hazards due to decreased contrast sensitivity, and to see dials on appliances. (Tr. 275-76.) Plaintiff was loaned "+6" glasses and task lighting. (Tr. 275.)

Plaintiff then followed up at the Retina Center on June 8, 2005. (Tr. 220.) She reported that her vision was about the same, but she had sharp pain over the last eight weeks. (Id.) Several weeks later, Dr. Rath wrote to Plaintiff in response to a phone call she received while on leave. (Tr. 266-67.) Dr. Rath noted Plaintiff had called about increased eye pain and decreased vision, and reported she had not been using her eye drops, and had not followed up with Dr. Gilbert. (Tr. 266.) Dr. Rath wrote that Plaintiff had a very serious eye condition that could cause blindness if not treated. (Id.) Dr. Rath strongly recommended that Plaintiff be seen by herself or Dr. Gilbert. (Id.)

On August 4, 2005, Dr. Rath noted that Dr. Gilbert weaned Plaintiff off eye drops, and did not give her Kenalog injections. (Tr. 264.) Plaintiff did not have significant pain or

discomfort, but her vision had not improved.  (Id.)  Dr. Rath noted Plaintiff's vision was stable overall, but varied from day to day.  (Id.)  Plaintiff's visual acuity was 20/150 bilaterally.  (Id.)  Dr. Rath gave Plaintiff posterior subtenon's Kenalog injections and subconjunctival Kenalog to treat bilateral active cystoid macular edema ("CME") and uveitis.  (Tr. 265.)  Dr. Rath also prescribed eye drops.  (Id.)

Two weeks later, Plaintiff reported feeling better, but still having eye pain and photopsias.  (Tr. 449.)  Her visual acuity was 20/100 on the right and 20/80 on the left.  (Id.)  Dr. Rath could not discern whether Plaintiff had active CME. (Id.)

On August 30, 2005, Dr. Rath wrote to Disability Advocates of Duluth, and stated that Plaintiff had bilateral uveitis and cystoid macular edema.  (Tr. 242.)  She noted that Plaintiff had severe limitation of visual acuity, which resulted in inability to distinguish fine details, and inability to read or perform fine work.  (Id.)  Dr. Rath stated that Plaintiff's final visual acuity outcome was not known, but she was at 40% visual acuity efficiency in both eyes.  (Id.)  Dr. Rath also completed a Medical Opinion Form for Plaintiff on August 31, 2005.  (Tr. 250.)  She indicated Plaintiff would not be able to work with her current level of vision, but it was not known if her condition was temporary or permanent.  (Id.)

 Plaintiff followed up with Dr. Rath on September 15, and reported that her vision was improved, but she suffered eye pain.  (Tr. 243.)  Plaintiff also reported occasional photopsias in both eyes.  (Id.)  Plaintiff's visual acuity was 20/80 on the right and 20/70 on the left.  (Id.)  Her visual field in the right eye was 100 degrees horizontally and 70 degrees vertically.  (Id.)  Her visual field in the left eye was 90 degrees horizontally and 60 degrees vertically.  (Id.)  She repeated steroid injections in Plaintiff's eyes.  (Id.)  Dr. Rath opined that Plaintiff's macular

edema had improved significantly, and her inflammation was under control. (Tr. 244.)

Plaintiff saw her therapist, Beth Good, on September 21, 2005, and reported that she quit taking Paxil because it didn't work as well as Prozac. (Tr. 347.) Plaintiff complained of an overwhelming appetite, but low energy and motivation. (Id.) She also continued to have anxiety attacks and to feel overwhelmed. (Id.) Plaintiff was started on Zoloft. (Id.)

Plaintiff was referred to Dr. Ronald Messner at the Access Center in September 2005, for evaluation of systemic disease related to her uveitis. (Tr. 254-58.) Plaintiff reported constant pain in her eyes at a level of six on a scale of one to ten. (Tr. 254.) Dr. Messner did not find systemic symptoms. (Tr. 258.)

On November 11, 2005, Dr. Rath noted that Plaintiff's conditions of bilateral panuveitis and cystoid macular edema were improved, as was Plaintiff's vision. (Tr. 252.) She noted that Plaintiff's pain had also improved, but continued intermittently. (Id.) Plaintiff's visual acuity was 20/150 on the right and 20/100 on the left. (Id.) Plaintiff was given steroid injections in both eyes. (Id.)

On December 9, 2005, Dr. Gilbert wrote to Disability Determination Services to describe Plaintiff's functional limitations. (Tr. 228.) He stated that his last examination of Plaintiff was in June 2005, and her vision was 20/80 on the right and 20/63 on the left. (Id.) He stated that Plaintiff had chronic uveitis with visual limitation. (Id.) Dr. Gilbert opined Plaintiff would have difficulty reading, but she had no other restrictions. (Id.)

When Plaintiff saw her therapist on December 27, 2005, she reported that she felt exhausted all of the time with no energy or motivation. (Tr. 348.) She had gained twenty pounds from overeating. (Id.) Plaintiff was started on Wellbutrin. (Id.) One month later,

Plaintiff's mood was improving, but she had difficulty sleeping, low energy, and mild hopelessness and helplessness. (Tr. 349-50.) She also had occasional suicidal thoughts, and she endorsed panic attacks and depersonalization.[6] (Tr. 350.) Plaintiff reported excessive worry, fatigue and irritability. (Id.) She was hypervigilant. (Id.) She had flashbacks three times a week, but reported a lack of memory around particular incidents of abuse. (Id.) Her housing situation was stressful. (Id.) Plaintiff's mental status examination was normal. (Id.) Ms. Good diagnosed Plaintiff with major depressive disorder, moderate, recurrent, and a GAF score of 55. (Tr. 351.)

Plaintiff went to the emergency room at Grand Itasca Clinic & Hospital for treatment of eye pain on January 2, 2006. (Tr. 541.) Plaintiff's eye pain had been increasing and her vision decreasing over the last week. (Id.) Plaintiff stated that she took two Vicodin, which had not helped. (Id.) Plaintiff's visual acuity that day, without glasses, was 20/200 in each eye. (Id.) Dr. Terri Radovich prescribed Oxycodone, but wanted Plaintiff to see an Opthalmologist that day. (Id.) Dr. Shara Pehl noted later that day that Plaintiff did not show up for her appointment with an Ophthalmologist. (Tr. 543.)

Plaintiff underwent a psychological consultative examination with Dr. Harlan Gilbertson on February 14, 2006. (Tr. 285-92.) Dr. Gilbertson noted Plaintiff was obese, and wearing eyeglasses. (Tr. 285.) Plaintiff reported depression and anxiety from her history of domestic assault. (Tr. 286.) She reported anxiety for five years, related both to her visual deficits, and fear of her former husband attacking her, although he had moved to Arizona. (Id.) Dr.

---

[6]     Depersonalization is alteration in the perception of the self so that the usual sense of one's own reality is lost. Miller-Keane Encycl. & Dictionary 487.

Gilbertson noted Plaintiff was mildly interpersonally withdrawn, but with adequate eye contact and conversation.  (Id.)  Her mood was mildly dysphoric.  (Id.)

Dr. Gilbertson reviewed Plaintiff's history.  (Tr. 287.)  Plaintiff had discontinued her education in the tenth grade and did not obtain a GED.  (Tr. 287.)  She began working at age fourteen at a Dairy Queen, then worked at a McDonald's for two and a half years.  (Id.)  Her most recent employment was at a pawn shop, but she was terminated on April 1, 2004, for inappropriately taking money "due to her former husband's refusal to work and her need to pay their electric bill."  (Id.)  Dr. Gilbertson also noted Plaintiff was previously a victim of her former husband's following/stalking behavior.  (Id.)  Plaintiff reported that she was also physically abused by her mother, sexually abused by her father, and emotionally abused by her mother, father, and former husband.  (Tr. 287-88.)

Plaintiff reported on her daily functioning.  She awoke at 6:30, helped her son get ready for school, and fed her daughter.  (Tr. 288.)  She bathed and dressed herself, and made sandwiches for lunch.  (Id.)  She also prepared dinner.  (Id.)  She washed dishes every couple of days, and did laundry twice a week.  (Id.)  She did not travel independently to grocery shop. (Id.)  Her activities included watching television, listening to music, and caring for her children. (Tr. 289.)  Dr. Gilbertson noted mild psychiatric magnification, but found Plaintiff overall to be an adequate historian.  (Id.)  Dr. Gilbertson diagnosed major depressive disorder, single episode, mild; adjustment disorder with anxiety, mild; and a GAF score of 55-60.  (Tr. 291.)  He opined that Plaintiff had the mental capacities:

> to understand, remember and follow brief directions is within normal limits.  I believe she exhibits average range ability to deploy attention and sustain concentration, with mildly impaired ability to simultaneously process multiple tasks.  Her verbal

learning and retrieval is within the average range.  Her ability to
carry out work-like tasks with reasonable persistence and pace is
mildly impaired.  Her ability to respond to superficial and extended
contact with co-workers and supervisors is moderately impaired.
It is this writer's clinical opinion that Ms. Stoddard would
currently experience mild impairment in her ability to tolerate
stress and pressure typically found within an entry level workplace
setting.

(Tr. 292.)

The next day, Plaintiff saw her psychiatrist, Dr. Hanisch.  (Tr. 352-53.)  Plaintiff reported

some improvement with a higher dose of Wellbutrin.  (Tr. 352.)  Her mood was up and down,

her energy slightly increased, and her nightmares reduced.  (Id.)  Dr. Hanisch noted, "Debra's

vision is currently not very good and she gets steroid injections in her eyes on a regular basis.

She missed the most recent ones because she has a social security evaluation later this month and

does not want them to get a skewed impression of how things are going."  (Id.)  Dr. Hanisch

diagnosed major depressive disorder, moderate; post traumatic stress disorder; and panic with

agoraphobia.  (Id.)

On March 2, 2006, Plaintiff underwent a consultative physical examination with Dr.

Mitchell Gossman.  (Tr. 297.)  Plaintiff's visual acuity on February 27, 2006 was 20/100 in both

eyes with her glasses, and correctable to 20/60 with "reduction of her hyperopic correction."  Dr.

Gossman noted Plaintiff had limited peripheral field of vision in both eyes.  (Tr. 298.)  He

diagnosed chronic idiopathic panuveitis, steroid responsive, with previous or chronic CME and

cataracts.  (Id.)  He opined that cataract surgery was reasonable because Plaintiff was

"significantly disabled by low vision," although he recognized the risk that surgery could

exacerbate her uveitis or trigger CME.  (Id.)  Dr. Gossman opined that Plaintiff would have

difficulty reading, and driving was not recommended.  (Tr. 298.)

A state agency consulting psychologist, Dr. R. Owen Nelsen, completed a Psychiatric Technique Review Form and a Mental Residual Functional Capacity Form regarding Plaintiff on March 22, 2006. (Tr. 303-16, 317-20.) He opined that Plaintiff had an affective disorder under Listing 12.04, and that it caused mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace, with no episodes of decompensation. (Tr. 306, 313.) Dr. Nelsen opined that Plaintiff would have the mental residual functional capacity to concentrate on, understand, and remember routine, three and four step and detailed instructions; carry out such tasks with adequate persistence and pace, with brief and superficial contact with coworkers, the public, and supervisors; and she could handle ordinary routine supervision, and the routine stressors of a routine, repetitive work setting. (Tr. 319.)

A state agency consultant, Dr. Jeffrey Gorman, completed a Physical Residual Functional Capacity Form regarding Plaintiff on March 26, 2006. (Tr. 324-31.) He opined that Plaintiff would have difficulty with work requiring fine detail or good visual fields or in a cluttered environment, she should not drive commercially, and she should avoid hazards. (Tr. 325, 327-28.)

Plaintiff followed up with P.A. Coleman regarding her headaches on March 28, 2006. (Tr. 337-38.) Plaintiff reported that her headaches varied in frequency, sometimes daily or several weeks apart. (Tr. 338.) Midrin had helped, but her insurance would no longer cover it. (Id.) Coleman prescribed Inderal and Vicodin. (Id.)

Plaintiff saw her therapist again on May 2, 2006, and reported mood swings, lack of energy, and large appetite. (Tr. 355.) She was easily overwhelmed and had to leave crowded

stores, but she said her anxiety was better.  (Id.)  Plaintiff requested to go back on Prozac.  (Id.)

Plaintiff was treated by Dr. Timothy Bonner at the Bonner Eye Clinic on August 10, 2006.  (Tr. 395.)  She complained of sharp pain in the back of her eyes over the last month.  (Id.)  Her last eye injections were in April 2006.  (Id.)  Dr. Bonner assessed Plaintiff with recurring iritis secondary to trauma.  (Id.)  He opined that Plaintiff could consider cataract surgery after her iritis was quiet for four to six months.  (Id.)  At Plaintiff's next visit, she reported she was much better after the steroid injections on August 10.  (Tr. 394.)  Plaintiff also noted that when she was on Flexeril, she could see better.  (Id.)  Plaintiff was given steroid injections in her eyes, and the injections were repeated on October 30, 2006.  (Tr. 393-94.)

Plaintiff went to the Grand Itasca Clinic & Hospital on September 18, 2006, to establish care after moving into the Grand Rapids area.  (Tr. 551.)  Dr. Terri Radovich refilled Plaintiff's prescriptions and recommended a drug contract for Vicodin at Plaintiff's next visit.  (Id.)

Plaintiff called the Bonner Eye Clinic on November 20, 2006, to report severe right eye pain.  (Tr. 393.)  Plaintiff was treated and her pain resolved.  (Id.)  When Plaintiff followed up on December 4, 2006, she reported that the steroid injections had helped.  (Tr. 392.)

On January 3, 2007, Plaintiff saw Dr. Radovich for eye pain, and she signed a narcotic contract for Vicodin.  (Tr. 540.)  Plaintiff also reported difficulty sleeping, and Dr. Radovich prescribed Trazadone.  (Id.)

Plaintiff followed up at the Bonner Eye Clinic on February 7, 2007, and she reported her pain was better, but her vision was foggy.  (Tr. 389.)  Dr. Bonner noted only mild iritis on the left.  (Id.)  One month later, Plaintiff reported she was getting along "ok," but was still seeing "lines and dots."  (Id.)  On March 21, 2007, Plaintiff was pain free but could hardly see when she

awoke. (Tr. 388.) Plaintiff was given steroid injections. (Id.) A week later, the injection site was swollen and bruised, but Plaintiff said her vision was improving, and she was not in pain. (Id.)

On April 2, 2007, Plaintiff's uveitis was much improved, but she complained of eye pain after reading for an hour. (Tr. 387.) The next month, her vision was stable. (Id.) Plaintiff then had a flare up at the end of May, with sore, swollen eyes and blurred vision. (Tr. 386.) She was given steroid injections in her eyes. (Id.)

Plaintiff underwent a psychiatric consultation with Dr. Thomas Kefalas at Northland Counseling Center on May 1, 2007. (Tr. 374-77.) At the time, Plaintiff was no longer seeing a therapist, and she was referred by her children's case manager. (Tr. 374.) Plaintiff reported intense anxiety in crowds, with shortness of breath, lightheadedness, and palpitations. (Id.) She also reported fear of being in an unfamiliar place. (Id.) On mental status examination, Plaintiff appeared nervous, worried and sad. (Tr. 376.) Her concentration was reduced. (Id.) Dr. Kefalas diagnosed major depressive disorder, moderate; post traumatic stress disorder; and panic disorder with agoraphobia. (Tr. 376.) Plaintiff was taking Fluoxetine, which Dr. Kefalas increased. (Id.) He referred Plaintiff to Dr. Carol McGinnis for individual therapy, noting that Plaintiff continued to have significant difficulty from trauma in her past. (Id.) When Plaintiff saw Dr. Kefalas on June 26, 2007, she felt less depressed since the increase of Prozac. (Tr. 372.)

On June 4, 2007, Plaintiff reported improvement of her depression after her Prozac was increased. (Tr. 373.) However, she reported restlessness and shakiness while asleep at night. (Id.) Dr. Kefalas increased Plaintiff's Prozac again, and started Plaintiff on Lunesta. (Id.) That

same day, Plaintiff was treated in the emergency room at Grand Itasca Clinic & Hospital for sore eyes after having eye injections at Bonner Eye Clinic. (Tr. 504.) Plaintiff was given a prescription for Vicodin. (Id.)

Plaintiff saw Dr. Bonner on July 12, 2007, and reported having sore eyes and seeing "strobe lights." (Tr. 385.) Dr. Bonner recommended steroid injections. (Id.) At the end of August, Plaintiff had ongoing headaches and eye pain, but less severe since the injections. (Tr. 384.)

On August 7, 2007, Plaintiff reported to Dr. Kefalas that she was having increased anxiety over issues dealt with in psychotherapy. (Tr. 371.) She was, however, sleeping well using Lunesta. (Id.) Dr. Kefalas noted Plaintiff was stable overall. (Id.)

Plaintiff went to the emergency room at Grand Itasca Clinic & Hospital for treatment of a headache on September 10, 2007. (Tr. 486.) Plaintiff stated Vicodin was not helping, and her headache had lasted a week. (Id.) Plaintiff saw Dr. Radovich the next week, and complained of puffy, swollen eyes, and headaches that were sometimes responsive to Vicodin. (Tr. 484.)

On October 8, 2007, Plaintiff reported to Dr. Kefalas that she was getting adequate sleep but still feeling fatigued. (Tr. 370.) Dr. Kefalas started Plaintiff on Provigil. (Id.) At the end of October, Plaintiff continued to have difficulty with low energy and reported Provigil had not helped. (Tr. 369.) Dr. Kefalas prescribed Wellbutrin. (Id.)

Plaintiff saw Dr. Bonner again on October 22, 2007, and complained of daily headaches and eye pain for a week. (Tr. 384.) Dr. Bonner gave Plaintiff steroid injections in her eyes. (Id.)

When Plaintiff saw Dr. McGinnis on November 6, 2007, Dr. McGinnis assessed Plaintiff

with a GAF score of 45. (Tr. 409.) Dr. McGinnis noted the following problems: "1) PTSD with particular recent identification of chronic use of dissociation[7] to cope;" and "2) isolation, agoraphobia, using daughter to project fear . . ."[8] (Id.) Several days later, Dr. McGinnis wrote to IM Care about her treatment of Plaintiff. (Tr. 408.) Dr. McGinnis noted that she began treating Plaintiff in May 2007, and Plaintiff's attendance was not good at first, although now she attended regularly. (Id.) She reported that Plaintiff was working on PTSD, but experienced serious, self-taught dissociation, with fear of people, isolation, and nightmares. (Id.) Dr. McGinnis stated, "[s]he is receiving as much support in services as is possible or acceptable to her. She will not go to a women's group. She has agreed to some daycare for her daughter (whom she tends to hide behind as an excuse to isolate.) We are doing all this to keep her from decompensating or requiring chronic hospitalization." (Id.) Dr. McGinnis opined that ongoing psychotherapy was critical for Plaintiff. (Id.)

On January 9, 2008, Plaintiff reported to Dr. Bonner that she still had pinprick type pain in her eyes, and the intensity varied. (Tr. 381.) Dr. Bonner treated Plaintiff with steroid injections in her eyes. (Id.)

Plaintiff saw Dr. Jack Carlisle at Grand Itasca Clinic & Hospital for a refill of Vicodin on February 22, 2008. (Tr. 479.) Plaintiff reported eye pain since having injections in her eyes. (Id.) Plaintiff also reported that she was changing doctors because Dr. Radovich was reluctant to prescribe narcotics to her. (Id.) Dr. Carlisle discussed the difficulties of prescribing narcotics

---

[7]     Dissociation is segregation of a group of mental processes from the rest of a person's usually integrated functions of consciousness, memory, perception, and sensory and motor behavior. Miller-Keane Encycl. & Dictionary 528.

[8] The remainder of the handwritten sentence is illegible.

with Plaintiff, but renewed her prescription for Vicodin.  (Id.)

Plaintiff was treated by Dr. Radovich for eye pain in the emergency room at the Grand Itasca Clinic & Hospital on April 4, 2008.  (Tr. 474.)  Plaintiff rated her pain as eight on a scale of one to ten, with some photophobia.  (Tr. 475.)  Plaintiff was treated with pain medication, and given a refill of Vicodin.  (Id.)

Dr. Timothy Bonner completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) regarding Plaintiff on April 7, 2008.  (Tr. 423-26.)  Dr. Bonner stated, "[d]ue to reduced vision, the patient cannot drive in suboptimal conditions and could have difficulty with tasks that require fine vision, such as assembly and inspection of small parts." (Tr. 426.)  He noted that on February 22, 2008, Plaintiff's best visual acuity with correction was 20/70 on the right and 20/50 on the left.  (Tr. 425.)  He also opined that Plaintiff's reduced vision could be a safety issue around moving machinery.  (Id.)

When Plaintiff saw Dr. Bonner on February 29, 2008, her eyes were better since the last week.  (Tr. 380.)  She next followed up on April 8, when she was in a lot of pain.  (Tr. 379.) However, Dr. Bonner noted her iritis was clearing.  (Id.)

On April 20, 2008, Dr. McGinnis wrote a summary of Plaintiff's psychological care.  (Tr. 407.)  She noted Plaintiff did not trust herself or others.  (Id.)  When Plaintiff started therapy, she was angry, withdrawn, isolated, and had symptoms of PTSD.  (Id.)  Plaintiff cut short her case management services because she thought "they were against her."  (Id.)  Plaintiff's therapy ended on March 24, 2008, but Plaintiff reported it was helpful in reducing the severity of her symptoms.  (Id.)  Dr. McGinnis stated that her diagnoses remained the same, and Plaintiff continued to be isolative and withdrawn.  (Id.)

Dr. McGinnis also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) Form regarding Plaintiff. (Tr. 411-13.) She opined that Plaintiff would have extreme limitations in the following areas: relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stresses; behave in an emotionally stable manner; and relate predictably in social situations. (Tr. 411-12.) She also opined that Plaintiff would have moderate limitations in the following areas: function independently; maintain attention/concentration; understand and carry out complex job instructions; understand and carry out detailed, but not complex, job instructions; and demonstrate reliability. (Id.)

Plaintiff saw Dr. Stephen C. Kaufman in the Cornea Clinic at the University of Minnesota-Fairview Medical Center on June 5, 2008. (Tr. 428-29.) On examination, Plaintiff's visual acuity was 20/100 in the right eye, and 20/70 in the left. (Tr. 428.) Her pupils remained fixed. (Id.) She had mild swelling in both lower eyelids. (Id.) There were synechiae in both eyes, and evidence of cataracts. (Id.) Dr. Kaufman recommended repeat systemic work-up and follow up in the Oculoplastics Clinic for her eyelid swelling. (Id.)

On August 5, 2008, Steve Pasola, a Rehabilitation Counselor at State Services for the Blind ("SSB") wrote to Laura Ross at Northwest Disability Services about Plaintiff. (Tr. 470.) Mr. Pasola noted that Plaintiff's visual prognosis was guarded, but there was a fair chance she would have stable vision for the foreseeable future. (Id.) He noted that Plaintiff's vision loss met the eligibility requirements for the Workforce Development Unit of SSB. (Id.) He also noted that Plaintiff met with an SSB Psychologist for a vocational assessment on April 7, 2008. (Id.)

In dismissing Plaintiff's claims for disability benefits, the ALJ made the following

findings of fact and conclusions of law:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 2007.

2.  Since the alleged disability onset date, April 1, 2004, the claimant engaged in substantial gainful activity from January 2005 through September 2005.  (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.420(b), 416.971 *et seq.*)[9]

3.  The claimant has the following severe impairments: bilateral uveitis and bilateral cystoid macular edema.  (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (20 CFR 404.1520(d), 404.1526, 404.1526, 416.920(d), 416.925, 416.926.)

5.  After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: avoid cluttered environments; no commercial driving; no work around hazards, machinery, or heights; no fine work or work requiring close vision, fine detail, or good visual fields; and no work involving stoves.

6.  The claimant is unable to perform any past relevant work.  (20 CFR 404.1565 and 416.965).

7.  The claimant was born on September 9, 1969, and was 34-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (20 CFR 404.1563 and 416.963.)

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (See SSR

---

[9]     In 2005, Plaintiff sold Avon and made $10,216.00.  (Tr. 12.)

82-41, and 20 CFR Part 404, Subpart P, Appendix 2.)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1560(c), 404.1566, 416.960(c), 416.966)

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2004 through the date of this decision. (20 CFR 404.1520(g) and 416.920(g))

## III. ANALYSIS

### A. Standard of Review

Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. 405(g); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. Moore ex rel Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).

"When an administrative agency has made an error of law, the duty of the Court is to 'correct the error of law committed by that body, and, after doing so to remand the case to the (agency) so as to afford it the opportunity of examining the evidence and finding the facts as required by law.'" NLRB v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler,

Pneumatic Tube, Ice Machine & Gen. Pipefitters of New York and Vicinity, Local Union No. 638, 429 U.S. 507, 522 n. 9 (1977) (quoting ICC v. Clyde S.S. Co., 181 U.S. 29, 32-33, 21 S.Ct. 512, 514, 45 L.Ed.729 (1901).  However, "[r]eversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability."  Pate-Fires v. Astrue, 564 F.3d 935, 947 (8th Cir. 2009) (citing Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997).

**B.     Remand is the appropriate remedy because additional factual findings by the agency are required.**

The Commissioner has determined the ALJ erred in assessing Plaintiff's mental impairments and requests remand "to develop evidence such as an additional evaluation of Ms. Stoddard's mental impairments, medical source opinions and her concomitant residual functional capacity, and availability of jobs in the economy."  (Defendant's Memorandum in Support of Motion for Voluntary Remand at 1, Doc. No. 24.)  Defendant contends remand for an immediate award of benefits is inappropriate because there are varying physicians' opinions concerning Plaintiff's mental impairments, and the ALJ gave good reasons for discrediting Dr. Carol McGinnis' opinion that Plaintiff could not work due to her mental impairments.  Defendant also contends that if Dr. McGinnis' opinion were controlling, an ALJ would need to determine an onset date of disability because Plaintiff did not begin seeing Dr. McGinnis until November 2007, and Plaintiff alleges a disability onset date of April 1, 2004.  Furthermore, Defendant contends the ALJ's physical residual functional capacity finding addressed all of Plaintiff's visual limitations.  Defendant asserts that even if the ALJ should have included additional visual limitations in Plaintiff's residual functional capacity, remand would be appropriate for further proceedings to determine whether any jobs existed that Plaintiff could perform given those

limitations.

Plaintiff opposes remand for further proceedings and requests reversal with remand for an immediate award of benefits.  Plaintiff contends the ALJ erred by failing to include in the RFC finding that Plaintiff has variable vision on any given day, and if such a limitation were included in her RFC, she would be precluded from performing any job on a regular basis. Plaintiff asserts the ALJ ignored VE testimony that expressed doubt about Plaintiff's ability to work.

Plaintiff also contends her severe mental impairments compound her severe vision problems and render her unable to work.  Plaintiff cites Dr. McGinnis' opinion that Plaintiff would have extreme difficulty with relating to co-workers, dealing with the public, using judgment, interacting with supervisors, and dealing with work stress.  Plaintiff asserts that in combination with her poor vision, her fear of leaving the house, limitations in interacting with others, and anxiety attacks overwhelmingly render her disabled.  However, if the Court finds remand for further proceedings appropriate, Plaintiff requests the Court to instruct the Commissioner to include the following limitations in her RFC:  significant fluctuation in her vision, inability to adjust to various lighting conditions, seeing spots, difficulty seeing color and shades of color, and those mental limitations described by Dr. McGinnis.  Plaintiff also requests a different ALJ on remand.

### 1.    Evaluation of Visual Impairments

The ALJ's findings of Plaintiff visual impairments and limitations are supported by substantial evidence in the record including:  Dr. Rath's opinion that Plaintiff would be unable to distinguish fine details, and unable to read or perform fine work (Tr. 242); Dr. Gilbert's opinion

that she would have difficulty reading (Tr. 228); Dr. Gossman's opinion that she would have difficulty reading and shouldn't drive; Dr. Bonner's opinion that Plaintiff should not drive "in suboptimal conditions and could have difficulty with tasks that require fine vision, such as assembly and inspection of small parts" (Tr. 426); and Dr. Gorman's opinion that she would have difficulty with work requiring fine detail or good visual fields or in a cluttered environment, and she should not drive commercially, and should avoid hazards. (Tr. 325, 327-28.) However, the Court shares Plaintiff's concern about the VE's testimony. In his testimony about work a person could perform based on the ALJ's hypothetical question, the VE said:

> Usually, if I see something like this, Judge, I look at, depending on how, how severe the actual vision is, looking at some bench work assembly occupations in either light or medium or larger objects in that you've asked me to consider no fine detail, and, you know, there are assembly positions with larger objects . . . Basically, route assembly, non speeding, dealing with larger objects as opposed to fine, fine objects. If a person, the only concern I have there, Judge, is with the field of vision, again, a person would have to get to the work site and there wouldn't be normally hazards of dangerous machinery involved, but they have to avoid normal desktops or work tables, things of that nature.

(Tr. 39.) Given that the VE had also testified that Plaintiff could not perform her past relevant work of restaurant night shift manager because her limited field of vision might cause her to walk into tables or customers or difficulty walking around in general (Tr. 39), the ALJ should have inquired further if a person with Plaintiff's field of vision could actually be employed at the type of work sites the VE suggested. As the VE's testimony indicates, there is more to full time competitive employment than being capable of seeing well enough to assemble a large object. The ALJ should address this issue with a vocational expert upon remand.

## 2. Evaluation of Mental Impairments

The ALJ's analysis of Plaintiff's mental impairments was superficial at best. For example, the ALJ rejected Dr. McGinnis' opinion because "she [did] not take into account the claimant's inability to drive due to her visual impairment and lack of childcare. . ." (Tr. 17.) These are not factors that are relevant to Plaintiff's mental residual functional capacity. The ALJ also states that no other mental health provider "noted any agoraphobia or the level of limitation that Dr. McGinnis reports." (Tr. 17.) It is true that no other mental health provider described the level of limitation that Dr. McGinnis described, but no other treating physician was specifically asked about Plaintiff's mental residual functional capacity. Furthermore, contrary to the ALJ's finding, Dr. Hanisch and Dr. Kefalas also diagnosed agoraphobia. (Tr. 230, 376.)

Plaintiff was not so fearful as to be unable to leave her home, as she frequently went to medical appointments, but the ALJ must consider if Plaintiff's fearfulness and anxiety outside of the home would cause her any work-related limitations, taking into account any fluctuations in her mental health. The record does not contain all of Dr. McGinnis' treatment records involving Plaintiff. In a letter dated November 12, 2007, Dr. McGinnis wrote that she began seeing Plaintiff in May 2007, but the earliest treatment record from Dr. McGinnis in the record is from November 2007. (Tr. 408-09.) On April 20, 2008, Dr. McGinnis wrote a summary of her treating relationship with Plaintiff, noting it ended in March 2008, but none of the records from after the November 2007 visit are in the administrative record. Thus, it is difficult to determine from the record whether the functional limitations Dr. McGinnis described are based solely on Plaintiff's subjective complaints, or if her opinions of Plaintiff's functional limitations are based on her clinical observations. Furthermore, as Defendant points out, Plaintiff's mental condition may have deteriorated at the time she began seeing Dr. McGinnis in November 2007, which

raises the issue of whether Plaintiff might have become disabled after her alleged onset date of April 1, 2004, but within the relevant time frame. On remand, the ALJ should attempt to obtain Dr. McGinnis' complete treatment records, mental residual functional capacity opinions from Dr. Hanisch, therapist Beth Good, and Dr. Kefalas, or if those materials cannot be obtained, otherwise further develop the record concerning Plaintiff's mental impairments. In summary, the ALJ erred in relying on the vocational expert's unclear testimony about Plaintiff's ability to perform large object assembly type jobs given her potential difficulties getting to and navigating around the work site. The ALJ also erred in his analysis of Plaintiff's mental impairments. Remand is required because further development of the record is necessary, and the ALJ will be required to make factual findings based on the new record.

## IV. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.  Plaintiff's Motion for Summary Judgment (#13) **be GRANTED IN PART AND DENIED IN PART**;

2.  Defendant's Motion for Voluntary Remand (#23) **be GRANTED**;

3.  This case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision;

4.  The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**

DATED: August 6, 2010

*s/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 23, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within 14 days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A district court judge shall make a de novo review of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.